# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

BILLY GINWRIGHT,

    Plaintiff,

v.

    Civil Action No. TDC-16-0565

EXETER FINANCE CORP.,

    Defendant.

## MEMORANDUM OPINION

Plaintiff Billy Ginwright has brought suit against Defendant Exeter Finance Corporation ("Exeter") alleging violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 (2012), and the Maryland Telephone Consumer Protection Act ("MTCPA"), Md. Code Ann., Com. Law §§ 14-3201 to 3202 (2013). Ginwright alleges that Exeter violated these laws by calling his cellular telephone repeatedly without his consent between June 2013 and July 2015. Pending before the Court are Exeter's Motion for Summary Judgment and Ginwright's Motion for Class Certification. For the reasons set forth below, both Motions are denied.

## BACKGROUND

### I.    Exeter

Exeter is an automobile finance company that purchases consumer contracts known as "consumer automobile retail installment contracts" from car dealerships. These contracts are typically purchased shortly after a purchaser agrees to buy a vehicle on credit. Once Exeter acquires a contract, it provides financing to the purchaser and becomes responsible for servicing

the loan through activities such as processing payments, notifying borrowers of delinquency, and repossessing the vehicle in the event of non-payment.

Since Exeter acquires contracts from multiple dealerships, it does not maintain a standard form document for each customer. Once Exeter decides to purchase a contract, it stores an electronic copy of whatever credit application and retail installment contract forms were signed by the customer at the dealership. The particular terms of Exeter's agreements with its customers, such as enforceable arbitration agreements, class action waivers, and consent to telephone contact, therefore vary from customer to customer depending on the dealership at which the loan originated.

Before providing financing, Exeter conducts a "confirmation call" with a prospective customer using the telephone number the customer provided on the credit application completed at the dealership. During the confirmation call, Exeter verifies the information in the credit application, including the phone number provided, and asks for consent to call that number. If Exeter decides to purchase the customer's contract, the next contact with the customer occurs during a "welcome call" placed by Exeter. During this call, an Exeter representative confirms the customer's account and contact information. Subsequent calls from Exeter to a customer occur on an as-needed basis. For example, an Exeter representative may call customers with delinquent accounts to ask them to make payments on their loans.

Exeter conducts and manages telephone calls to its customers through a system known as Aspect that automatically dials calls. Aspect replaced an earlier system, Five9, in September 2012. Aspect maintains a record of when a particular customer was called, at what number, and a brief description of the disposition of that call. For example, Aspect records whether Exeter left a message on a customer's answering machine or if a customer promised to make a payment

on the loan. Exeter maintains audio recordings of many, but not all, of its calls with customers. Certain customer calls may have been made through other call management systems, the records of which are not necessarily maintained by Exeter.

Exeter's overall loan servicing records are maintained in a system known as Shaw. The Shaw System includes contemporaneous notes of phone conversations made by Exeter representatives during phone calls with customers, including notations on whether a customer has consented to telephone contact from Exeter.

## II. Calls to Ginwright

On May 23, 2013, Ginwright purchased a vehicle from Baltimore Washington Auto Outlet ("BW Auto Outlet") of Hanover, Maryland and sought a loan to pay for it. Ginwright signed two documents relating to financing. On the first document, a credit application ("the Credit Application") issued by a company called DealerTrack, Ginwright listed his cell phone number in the box for his home phone number and agreed to the following statement:

> You expressly consent to us using prerecorded/artificial voice messages, text messages, and/or automatic dialing equipment while servicing or collecting your account, as the law allows . . . you agree that we may take these actions using the telephone number(s) that you provide us in this credit application, you provide to us in the future, or we get from another source, even if the number is for a mobile or cellular telephone and/or our using the number results in charges to you.

Joint Record for Motion for Summary Judgment Briefing ("MSJ JR") 364. The Credit Application authorized the dealership to solicit financial institutions to extend credit to Ginwright for the purchase of the vehicle. Exeter was not specifically referenced anywhere on the Credit Application.

The same day, Ginwright also signed a Retail Installment Sale Contract ("RISC") with BW Auto Outlet, which established the conditions for purchasing the vehicle on credit and the terms for repayment of the loan. The RISC included an integration clause that stated:

> This contract, along with all other documents signed by you in connection with the purchase of this vehicle, comprise the entire agreement between you and us affecting this purchase. No oral agreements or understandings are binding. Upon assignment of this contract: (i) only this contract and the addenda to this contract comprise the entire agreement between you and the assignee relating to the contract; (ii) any change to this contract must be in writing and the assignee must sign it; and (iii) no oral changes are binding.

MSJ JR 371. The RISC was assigned to Exeter, which issued a loan to Ginwright.

Exeter began making calls to Ginwright's cell phone. Having some familiarity with the process of purchasing a car on credit, Ginwright expected to receive calls from a third-party financing company such as Exeter after he purchased the vehicle. These calls began as messages designed to introduce Ginwright to his account with Exeter but eventually transitioned into calls regarding overdue payments on his loan. Exeter made over 1,800 calls to Ginwright between June 11, 2013 and July 30, 2015, up to as many as 12 times per day. All of these calls were placed through Aspect. Ginwright also made an unspecified number of calls to Exeter throughout this period.

During at least some of these calls, Ginwright confirmed his cell phone number with Exeter and stated that it was the primary way to contact him. For example, on June 17, 2015, an Exeter representative asked Ginwright to "confirm that [by] providing Exeter Finance with your cell phone number you are giving consent to use this number as a way of contacting you," to which Ginwright responded "yes." MSJ JR 426. Ginwright confirmed his cell phone number with Exeter during calls on February 12, 2014, March 1, 2014, July 10, 2014, and April 29, 2015, describing it as his primary or only contact number.

Ginwright also expressed frustration with Exeter's calls. During a conversation with an Exeter representative on December 5, 2013, Ginwright asked why he was still receiving multiple calls a day despite scheduling an online payment for his debt. The representative told Ginwright

that the calls could not be stopped until the end of a 14-day cycle during which the calls would be automatically made. Exeter called Ginwright again the next day, at which point Ginwright stated "I don't know why y'all keep calling me." MSJ JR 441. According to Ginwright, in various calls, he explicitly asked Exeter to "stop calling my phone" up to five different times. MSJ JR 67. Exeter's internal Shaw System records reflect that Ginwright's consent to receive calls was not granted on at least five separate occasions. Exeter periodically called Ginwright at his work phone number as well. However, Exeter stopped making those phone calls after Ginwright requested that they not call him at work.

## DISCUSSION

When a Motion for Summary Judgment and a Motion for Class Certification are both pending in a case, the Court has discretion to decide the question of summary judgment before reaching the issue of class certification. *See Toben v. Bridgestone Retail Operations, LLC*, 751 F.3d 888, 896 (8th Cir. 2014); *Curtin v. United Airlines, Inc.*, 275 F.3d 88, 92 (D.C. Cir. 2001); *see also* Fed. R. Civ. P. 23(c)(1) advisory committee's note to 2003 amendment. In this case, the Court finds that a consideration of Exeter's Motion for Summary Judgment sheds light on issues relevant to the disposition of the Motion for Class Certification. Therefore, the Court will first consider Exeter's Motion for Summary Judgment.

## I.       Motion for Summary Judgment

Exeter seeks summary judgment in its favor based on its assertion that the evidence conclusively establishes that Ginwright provided "prior express consent" to receive autodialed calls, within the meaning of the TCPA and the MTCPA. According to Exeter, Ginwright provided this consent by signing the Credit Application and through oral conversations with

Exeter representatives over the course of his loan. Exeter further contends that Ginwright never validly revoked his consent to receive calls from Exeter.

## A. Legal Standard

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.,* 346 F.3d 514, 522 (4th Cir. 2003). The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586-87 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. Id. at 248-49.

## B. TCPA and MTCPA

The TCPA was enacted in 1991 to address widespread consumer complaints over practices such as telemarketing. *Mims v. Arrow Fin. Serv., LLC*, 565 U.S. 368, 370-71 (2012). As relevant here, the statute bans the use of an automated telephone dialing system ("ATDS") to call a cellular telephone unless the caller has the "prior express consent" of the called party. 47 U.S.C. § 227(b)(1)(A). The TCPA provides a private right of action that allows aggrieved victims of such calls to bring suit in federal court against a caller who violates the statute. §

227(b)(3); *Mims*, 565 U.S. at 386-87. A plaintiff may recover statutory damages of $500 per call, or treble damages ($1,500 per call) if the defendant "knowingly and willfully violated" the law. 47 U.S.C. § 227(b)(3).

In order to succeed on his TCPA claim, Ginwright must show that Exeter (1) called his cellular telephone number; (2) using an ATDS; (3) without his "prior express consent." 47 U.S.C. § 227(b)(1)(A); *Los Angeles Lakers, Inc. v. FDIC*, 869 F3d 795, 804 (9th Cir. 2017). Since the MTCPA was merely enacted to enable a private right of action to enforce the TCPA in state court, these elements also apply to Ginwright's MTCPA claim. Md. Code Ann., Com. Law § 14-3201(2); *Worsham v. Ehrlich*, 957 A.2d 161, 171-72 (Md. Ct. Spec. App. 2008). This Court has jurisdiction over Ginwright's state law claim because the TCPA and MTCPA claims are part of the same case or controversy and arise from a common nucleus of operative fact, indeed, the exact same facts, such that supplemental jurisdiction is appropriate. *See* 28 U.S.C. 1367(a); *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725 (1966); *see also Sprye v. Ace Motor Acceptance Corp.*, No. PX-16-3064, 2017 WL 1684619 at *4 (D. Md. May 3, 2017) (finding supplemental jurisdiction over an MTCPA claim).

There is no significant dispute that Exeter called Ginwright's cell phone. Exeter's records show hundreds of calls to a phone number ending in 7835, the number that Ginwright identified as his cell phone. Since Exeter has over 300,000 customers, and virtually all of its calls to its customers are routed through the Aspect system, there is no significant dispute that Ginwright was called using an ATDS. Therefore, the key question is whether Ginwright consented to Exeter's ATDS phone calls.

### C. Express Consent

Although the term "prior express consent" suggests an explicit statement that an individual agrees to receive autodialed calls, the Federal Communications Commission ("FCC") has developed a specific interpretation of this language in the debtor-creditor context. To implement the TCPA, the FCC is empowered to promulgate regulations, the validity of which may not be challenged in federal district courts. *See* 47 U.S.C. § 227(b)(2); 28 U.S.C. § 2342(1) (2012) (vesting exclusive jurisdiction for review of FCC final orders in the courts of appeals); *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1119-21 (11th Cir. 2014) (holding that a district court lacked jurisdiction to review an FCC order defining prior express consent under the TCPA); *see also Blow v. Bijora, Inc.,* 855 F.3d 793, 802-03 (7th Cir. 2017) (noting that "absent a direct appeal" of an FCC Order, the court was "bound to follow it").

Under such an FCC ruling interpreting the TCPA, a debtor consents to receive autodialed calls from a creditor simply by providing a phone number at which to be contacted during the transaction that results in the debt. In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991 ("2008 FCC Ruling"), 23 FCC Rcd. 559, 564 (2008) (concluding that "autodialed calls" to "wireless numbers provided by the called party in connection with an existing debt are made with the 'prior express consent' of the called party"). This consent extends only to calls made regarding the debt. *Id.* It is not necessary for debtors to have disclosed their cell phone numbers directly to their creditors. Rather, debtors who provide their cell phone numbers to an intermediary are deemed to have provided them to creditors who received them from the intermediary. In re GroupMe, Inc./Skype Communications S.A.R.L. Expedited Declaratory Ruling Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991 ("2014 FCC Ruling"), 29 FCC Rcd. 3442, 3444-47 (2014) (referencing a prior ruling

that a consumer who provides a wireless phone number on a credit application has given prior express consent to autodialed calls to that number regarding the debt, including from debt collectors acting on behalf of the creditor). For example, in *Mais*, the debtor's wife included the debtor's cell phone number on a hospital admission form and signed a statement authorizing the hospital to disclose the debtor's information to third parties for billing and collection purposes. *Mais*, 768 F.3d at 1124. The United States Court of Appeals for the Eleventh Circuit concluded that Mais had provided his phone number to his creditor in a way that satisfied the TCPA's prior express consent exception. *Id.* at 1125; *accord Baisden v. Credit Adjustments, Inc.*, 813 F.3d 338, 346 (6th Cir. 2016); *Daubert v. NRA Group, LLC*, 861 F.3d 382, 389-91 (3d Cir. 2017).

Under this standard, Exeter clearly received Ginwright's prior express consent to call his cell phone about his debt. Ginwright listed his phone number on the Credit Application and authorized the dealership to provide his application to financial institutions, including Exeter. The phone number was provided on the same day that Ginwright purchased the vehicle and applied for a loan for the purchase of the vehicle. Under the FCC 2008 Order, this submission is sufficient to provide prior express consent to receive phone calls from a creditor about the debt owed.

This determination is consistent with other FCC rulings and the purpose of the TCPA. A debtor need only provide a cell phone number to the creditor, not provide it for any particular purpose. 2008 FCC Ruling at 564; *Hill v. Homeward Residential, Inc.*, 799 F.3d 544, 552 (6th Cir. 2015); *see also Selby v. LVNV Funding, LLC*, No. 13-cv-01383, 2016 WL 6677928 at *8 (S.D. Cal. June 22, 2016). A debtor also does not need specifically to consent to autodialed calls; consent to be called about the debt is sufficient to allow calls from an ATDS. 2008 FCC Ruling at 564; *Hill*, 799 F.3d at 552. Moreover, the FCC has concluded that finding consent

under these facts facilitates "normal, expected, and desired business communications." 2014 FCC Ruling at 3445. Indeed, Ginwright stated in his deposition that he expected to receive phone calls from Exeter after he purchased the vehicle.

Ginwright cites several cases in support of his position that a debtor providing a cell phone number on a credit application is not sufficient to establish "express consent," and that such consent must be "clearly and unmistakably stated" and explicitly authorize autodialed calls. Opp'n Mot. Summ. J. at 5, ECF No. 91. However, none of the cited cases involved the scenario addressed in the FCC ruling, calls made by a creditor to a debtor where the cell phone number had been provided to the creditor upon incurring the debt that was the subject of the calls. In *Nigro v. Mercantile Adjustment Bureau, LLC*, 769 F.3d 804 (2d Cir. 2014), for example, the court found no express consent when the plaintiff had given his phone number to the electric company to arrange for the termination of electrical service to the home of his deceased mother-in-law, because the number was not provided during the transaction leading to the preexisting debt owed by his mother-in-law. *Id.* at 806-07; *see also Thrasher-Lyon v. CCS Commercial, LLC*, No. 11 C 04472, 2012 WL 3835089 at *4 (N.D. Ill. Sept. 4, 2012) (finding no express consent when the plaintiff provided her cell phone number to the other driver and the police at the scene of an accident, then received calls from a debt collector for the other driver's insurance company). The other case did not even relate to calls made from a creditor to a debtor about an underlying debt. *See Satterfield v. Simon & Shuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009) (finding no express consent to receive promotional messages from a publisher based on signing up as a user of a website).

Ginwright also argues that Exeter's internal Shaw System loan servicing notes state that consent was not granted at various times over the life of the loan. Whether or not Ginwright

orally consented to autodialed calls during loan servicing discussions does not alter the analysis. Although such statements could have provided an additional basis to find express consent, the lack of such statements does not undo the Court's finding of express consent based on the undisputed fact that Ginwright provided his cell phone number on the Credit Application, which constitutes consent as a matter of law under the binding FCC ruling. Having found express consent based on the Credit Application, it is not necessary to reach Exeter's other theories for establishing that Ginwright provided express consent.

### D. Revocation of Consent

Even though Ginwright initially consented to autodialed calls to his cell phone about his car loan, Ginwright asserts that he later revoked that consent. The FCC has ruled that under the TCPA, "a called party may revoke consent" to autodialed phone calls "at any time and through any reasonable means." In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991 ("2015 FCC Ruling"), 30 FCC Rcd. 7961, 7993 (2015). This right to revoke is premised on the common law understanding of the meaning of "consent," which is voluntarily given and can be voluntarily taken away. *See Osorio v. State Farm Bank, FSB*, 746 F.3d 1242, 1255-56 (11th Cir. 2014) (finding that express consent may be revoked and that there was a genuine issue of material fact on whether the plaintiff revoked consent); *Gager v. Dell Fin. Serv.,* 727 F.3d 265, 270-71 (3d Cir. 2013) (holding that the TCPA allows consumers to revoke prior express consent); 2015 FCC Ruling at 7994. Moreover, as a remedial statute, the TCPA should be construed to benefit consumers. *Gager*, 727 F.3d at 271. A consumer may revoke consent by "any reasonable method including orally or in writing." 2015 FCC Ruling at 7996. Courts have applied this right in the context of consent given through a credit application, *Gager*, 727 F.3d at 267, and through an application for insurance, *Osorio*, 746 F.3d at 1247.

Ginwright was therefore permitted to revoke his consent to Exeter's phone calls even though he had earlier granted it by providing his cell phone number in the Credit Application. Exeter, however, argues that Ginwright had also consented to autodialed calls through a consent clause in the Credit Application, and that such consent was bargained-for consideration as part of a contract between Ginwright and Exeter and thus cannot be revoked. As support, Exeter cites *Reyes v. Lincoln Automotive Financial Services*, 861 F.3d 51 (2d Cir. 2017), in which the United States Court of Appeals for the Second Circuit held that the TCPA did not allow for revocation of consent when that consent "was included as an express provision of a contract." *Id.* at 57. Such a prohibition on later revocation of consent arising from a boilerplate consent provision, however, would be inconsistent with the FCC's ruling that a consumer has "a right to revoke consent," 2015 FCC Ruling at 7996, including when originally provided in a credit application, *id.* at 7993 n.216, and with the remedial purposes of the TCPA*, see Gager*, 727 F.3d at 271. The Court therefore declines to adopt the prohibition on revocation in *Reyes*, which would result in the effective circumvention of the TCPA in the debtor-creditor context. Indeed, Exeter itself has acknowledged that "[c]onsent under the TCPA is not a matter of contract, nor subject to contract principles." Opp'n Mot. Class Certification at 15, ECF No. 65.

In any event, it is not clear that the consent clause in the Credit Application could be construed as a bargained-for contract term. Even if it were deemed to be such a term, Ginwright was not contractually bound to it because a close reading of the relevant agreements reveals that the Credit Application was not part of Ginwright's contractual agreement with Exeter. The Credit Application, on its face, was not a contract between Ginwright and Exeter. The integration clause of the RISC provides that "[t]his contract, along with all other documents signed by you in connection with the purchase of this vehicle, comprise the entire agreement

between you and us affecting this purchase." MSJ JR 371. Under this provision, the Credit Application, as a "document signed by you in connection with the purchase" arguably was part of the agreement between Ginwright and the dealership. *Id.* The contractual agreement between Ginwright and Exeter, however, arose when the RISC was assigned to Exeter. The same integration clause further states that "[u]pon assignment of this contract: (i) only this contract and the addenda to the contract comprise the entire agreement between you and the assignee relating to this contract." *Id.* Because the Credit Application was not an addendum to the RISC, the plain language of the RISC does not include it in the agreement going forward between Ginwright and the assignee, Exeter. This plain language agreed to by the parties supersedes any general principles relating to assignments, and subsequent language in the assignment document does not amend this provision because Ginwright was not a party to the assignment. As a credit application signed by only one party, it cannot fairly be construed as a second contract with the same party akin to the Buyer's Order and RISC construed together in *McLarty v. Santander Consumer USA, Inc.*, 700 F.3d 690, 700 (4th Cir. 2012). Where Ginwright was not contractually bound by the consent clause in the Credit Application, the Court concludes that there was no bar to revocation of consent.

Although Ginwright was permitted to revoke his consent to Exeter's calls, the record does not establish definitively whether or when such revocation took place. Ginwright has testified that he told Exeter to "stop calling my phone" as many as five different times, but did not recall precisely when he gave that instruction. MSJ JR 66-67. Exeter has countered by asserting that it reviewed recordings of 89 calls with Ginwright and has not identified any instance in which Ginwright explicitly revoked consent to receive calls on his cell phone. Rather, it has offered one recorded call, on June 17, 2015, during which Ginwright specifically

granted Exeter consent to contact him on his cell phone, without stating whether he consented to autodialed calls. Exeter acknowledges, however, that the 89 recorded calls are not the entire universe of Ginwright's conversations with the company.

Moreover, the Shaw System loan servicing records list Ginwright as not having consented to calls on his cell phone on June 1, 2013; June 17, 2015; July 20, 2015; September 8, 2015; and September 9, 2015. Although Exeter claims that these notations suggest that Ginwright never asked Exeter to stop making phone calls to his cell phone, these entries, viewed in the light most favorable to Ginwright, provide some support for his contention that he told Exeter to stop calling his cell phone number. If a factfinder were to determine that Ginwright had revoked his consent, he could succeed on his TCPA and MTCPA claims, because there is no dispute that the calls to Ginwright continued unabated until July 30, 2015. Indeed, Exeter's representatives acknowledged to Ginwright that they could not stop the Aspect system from making autodialed calls to him. Because whether Ginwright revoked his consent to receive autodialed calls on his cell phone remains a genuine issue of material fact, the Court cannot grant summary judgment to Exeter on Ginwright's TCPA and MTCPA claims. *See, e.g. Lipscomb v. Aargon Agency, Inc.*, No. PWG-13-2751, 2014 WL 5782040 at *4 (D. Md. Nov. 5, 2014) (denying summary judgment on a TCPA claim because there was a genuine dispute of material fact on whether the plaintiff had revoked consent to receive calls). The Motion for Summary Judgment is therefore denied.

## II.     Motion for Class Certification

In his Motion for Class Certification, Ginwright seeks certification of the following class: "all persons within the United States who, on or after February 26, 2012 1) received a non-

emergency telephone call from Exeter 2) to a cellular telephone 3) through the use of an automatic telephone dialing system." Am. Mot. Class Certification at 1, ECF No. 72.

## A. Legal Standard

A class action allows representative parties to prosecute not only their own claims, but also the claims of other individuals which present similar issues. *Thorn v. Jefferson-Pilot Life Ins. Co,* 445 F.3d 311, 318 (4th Cir. 2006). The use of a class action is primarily justified on the grounds of efficiency, because it advances judicial economy to resolve common issues affecting all class members in a single action. *Id.* Because of the need to protect the rights of absent plaintiffs to assert different claims and of defendants to assert facts and defenses specific to individual class members, courts must conduct a "rigorous analysis" of whether a proposed class action meets the requirements of Federal Rule of Civil Procedure 23 before certifying a class. *See id.* Courts have wide discretion to certify a class based on their familiarity with the issues and potential difficulties arising in class action litigation. *See, e.g. Ward v. Dixie Nat. Life Ins. Co.*, 595 F.3d 164, 179 (4th Cir. 2010). A plaintiff has the burden to show that all of the necessary prerequisites for a class action have been met. *Gunnells v. Healthplan Serv., Inc.*, 348 F.3d 417, 458 (4th Cir. 2003).

The first of these prerequisites is that the class must exist and be "readily identifiable" or "ascertainable" by the court through objective criteria. *EQT Prod. Co v. Adair,* 764 F.3d 347, 359-60 (4th Cir. 2014). The class must then satisfy all four elements of Rule 23(a): numerosity, commonality, typicality, and adequacy. First, the proposed class must be so numerous that "joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Second, a class must have "questions of law or fact common to the class" which are capable of classwide resolution, such that the determination of the truth or falsity of the common issue "will resolve an issue that is

central to the validity of each one of the claims in one stroke." Fed. R. Civ. P. 23(a)(2); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Third, the named plaintiff must be "typical" of the class, such that prosecution of the named plaintiff's claim will "simultaneously tend to advance the interests of the absent class members." Fed. R. Civ. P. 23(a)(3); *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466-67 (4th Cir. 2006). Finally, the named plaintiff must "fairly and adequately protect the interests of class" without a conflict of interest with the absent class members. Fed. R. Civ. P. 23(a)(4); *Ward*, 595 F.3d at 179-80.

If the named plaintiff satisfies each of these requirements under Rule 23(a), the Court must still find that the proposed class action fits into one of the categories of class action under Rule 23(b) in order to certify the class. Under Rule 23(b)(1), a class action may be maintained if the plaintiff shows that absent a class action, there is a risk of "inconsistent or varying adjudications" across individual class members that would result in "incompatible standards of conduct" for the defendant, or a risk of individual adjudications resulting in dispositive rulings that "substantially impair or impede" the ability of other plaintiffs to protect their interests. Fed. R. Civ. P. 23(b)(1). A class action is also maintainable if the defendant has "acted or refused to act on grounds that apply generally to the class," such that injunctive or declaratory relief applying to the whole class is appropriate. Fed. R. Civ. P. 23(b)(2). Finally, a class action may be maintained under Rule 23(b)(3) if common questions of law or fact "predominate over any questions affecting only individual members" and a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The predominance and superiority requirements under Rule 23(b)(3) are designed to ensure that the class action "achieve[s] economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness of bringing

about other undesirable results." *Gunnells*, 348 F.3d at 424 (quoting *Amchem Prods. v. Windsor*, 521 U.S. 591, 615 (1997)). If the named plaintiff satisfies all of the Rule 23(a) requirements and one of the Rule 23(b) requirements, then class certification is appropriate.

### B.  Rule 23(a)

There is no significant dispute that Ginwright's proposed class is ascertainable and meets the requirements of numerosity and adequacy. Exeter has over 300,000 customers and maintains records of when a customer was called and what type of phone was called. Nor is there any indication that Ginwright's interests conflict with those of the absent class members or that his counsel is not capable of managing a large class action. However, the prerequisites of typicality and commonality are at issue.

To meet the typicality requirement, a plaintiff must show that the class representative's claims and defenses are "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Specifically, the "interest in prosecuting" the class representative's own case must "simultaneously tend to advance the interests of the absent class members." *Deiter*, 436 F.3d at 466. The plaintiff's claim "cannot be so different from the claims of absent class members that their claims will not be advanced by" proof of the plaintiff's own individual claim. *Id.* at 466-67. In analyzing this question, a court compares the class representative's claims and defenses with those of the absent class members, considers the facts needed to prove the class representative's claims, and assesses the extent to which those facts would also prove the claims of the absent class members. *Id.* These claims do not have to be factually or legal identical, but the class claims should be fairly encompassed by those of the named plaintiffs. *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 344 (4th Cir. 1998).

Here, Ginwright is similarly situated to other class members in that he is seeking to hold Exeter liable for making repeated, autodialed calls to his cell phone without his consent. Although Exeter notes that the success of Ginwright's claims may turn on specific facts relating to whether he consented to such calls or revoked such consent, advancement of Ginwright's claims would likely advance the claims of other class members. Ginwright's claims and defenses will center on arguments that the Aspect system constitutes an ATDS within the meaning of the TCPA, that he did not consent to the autodialed calls, whether through any documents signed in connection with the purchase of his car or in his communications with Exeter, and that he orally revoked any such consent. Where Ginwright, in advancing his claims, would argue that credit applications and RISCs do not establish consent, and that the lack of a record of revocation of consent does not preclude a finding of revocation, he would be taking positions that "simultaneously tend[] to advance the interests of the absent class members," who will likewise need to defend against similar arguments that they consented and failed to revoke. *Deiter*, 436 F.3d at 466. Thus, the Court finds that the typicality requirement has been satisfied.

When considering commonality, the Court looks for a common contention across the class that is capable of classwide resolution. *Wal-Mart*, 564 U.S. at 350. This prerequisite goes beyond the mere presence of "common questions of law or fact" and instead requires that answering such questions "will resolve an issue that is central to the validity" of each class member's claims "in one stroke." *Id.* Ginwright alleges that common questions include "whether Exeter utilized an ATDS to dial Class members' cellphones"; "whether Exeter knowingly or willfully violated the TCPA"; "whether Exeter should be enjoined from engaging in similar conduct in the future"; "and whether Exeter is liable to the Class for damages, and the measure of such damages." Am. Mot. Class Certification at 18, ECF No. 72. Whether the

dialing system used by Exeter to call class members' cell phones is a common issue that would resolve a required element of a TCPA claim across the class. Exeter, however, asserts that it used two different dialing systems, Five9 and Aspect, during the identified time period of the class action dating back to February 2012. To the extent the technology is different, the resolution of whether one of the dialing systems is an ATDS may not have classwide applicability. Moreover, there is no serious dispute whether the Aspect system qualifies as an ATDS system. Thus, that issue is not one that is "apt to drive the resolution of the litigation." *See Wal-Mart*, 564 U.S. at 350 (citation omitted).

Whether Exeter's calling of class members constituted knowing and willful TCPA violations is not a common issue across the class because resolution of that question for a particular class member likely depends on the circumstances surrounding the individual class member's consent, or lack of consent, to receive autodialed calls from Exeter, whether the class member revoked consent, and whether Exeter complied with those instructions. The questions whether Exeter should be enjoined or is liable for damages are issues related to remedies only, and whether there should be an injunction or damages applicable to any individual class member's situation would likewise depend on the consent and revocation issues, as a class member who had consented and never revoked would not be entitled to an injunction against further calls or damages for past calls. Thus, where the proposed class has been so broadly defined as to draw no distinctions between the type of calling system used and whether class members consented to receive calls or later revoked such consent, the Court cannot find that the commonality requirement has been established. *See, e.g.*, *Hicks v, Client Servs. Inc.*, No. 07-61822-CIV, 2008 WL 5479111, at *8 (S.D. Fla. Dec. 11, 2008) (holding in a TCPA claim against a debt collection agency that class certification for all Florida citizens who received a call

from the defendant on their cell phones via an ATDS over a four year period was not appropriate on commonality and predominance grounds because class adjudication could not be accomplished "without the trial degenerating into mini-trials on [the] consent of every class member"); *Balthazor v. Cent. Credit Servs., Inc.,* No. 10-62435-CIV, 2015 WL 6725872 at *5 (S.D. Fla. Dec. 27, 2012) (denying class certification on commonality and predominance grounds where consent issues were individualized).

C.      **Rule 23(b)**

Even if Ginwright could satisfy the Rule 23(a) factors, the Court finds that this case cannot be maintained under any of the Rule 23(b) categories. Ginwright seeks certification under Rule 23(b)(3), arguing that the common issues of the class predominate over any individual issues, and a class action is a superior method to resolve the controversy. Although similar to Rule 23(a)'s commonality requirement, the test for predominance under Rule 23(b)(3) is "far more demanding" and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623-24. Here, the most likely common issue, whether Exeter's dialing system qualifies as an ATDS, does not appear to be in serious dispute and cannot be deemed to predominate over the individualized issues of consent, which will drive the outcome of individual claims. In *Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318 (5th Cir. 2008), the United States Court of Appeals for the Fifth Circuit held that class certification of a TCPA claim based on blast faxes was inappropriate when there was no generalized, classwide basis to establish whether individual class members had consented to receipt of such faxes. *Id.* at 328-29. As discussed above, Ginwright's claim revolves around individualized questions of consent and the revocation of consent.

Exeter's customers do not complete a uniform credit application or RISC but instead complete non-standard forms received from a variety of different car dealerships that differ in certain language and terms. Whether an Exeter customer provided a cell phone number on such forms, or in oral conversations with Exeter, would differ on a case-by-case basis, and certainly whether such a customer revoked consent, whether orally or in writing, is an individualized question. Indeed, Ginwright persuasively argued, in opposing summary judgment, that Exeter's standard practices to ask certain questions during confirmation calls or welcome calls cannot be relied upon to establish consent in all cases. Thus, this is not a case in which the issues of consent and revocation can be resolved as a common issue with a single classwide answer, such as when all class members completed the same application form upon which the determination of consent can be made in a global manner, or when the defendant received all of the class members phone numbers through a single database. *See, e.g.*, *Manno v. Healthcare Revenue Recovery Grp., LLC,* 289 F.R.D. 674, 688 (S.D. Fla. 2013); *Kavu v. OmniPak Corp.*, 246 F.R.D. 642, 6475 (W.D. Wash. 2007).

This is also not a case in which consent is merely a theoretical issue. Exeter has established that as a matter of law, provision of a cell phone number in a credit application would constitute consent, *see supra* Part I.C., and that it has a standard practice of seeking consent from customers. *See Jamison v. First Credit Servs.*, 290 F.R.D. 92, 107 (N.D. Ill. 2013) (finding a lack of predominance where the defendant had shown evidence that a significant percentage of the putative class had consented to receive calls). Here, the Court finds that, as in *Gene and Gene*, the individualized issues relating to consent and revocation, on which claims will ultimately turn, predominate over any common issues such that "myriad mini-trials cannot be avoided" on the issues of consent and revocation. *Gene and Gene*, 541 F.3d at 329.

This conclusion is consistent with other district courts that have declined to certify TCPA classes of debtors under Rule 23(b)(3) on the grounds that common issues do not predominate over individualized ones. *See, e.g., Blair v. CBE Grp., Inc.*, 309 F.R.D. 621, 631 (S.D. Cal. 2015) (finding no predominance of common issues under Rule 23(b)(3) where class members' debts "arose in different contexts" requiring "extensive individual inquiries" to determine whether class members provided their cell phone numbers to the creditor); *Jamison*, 290 F.R.D. at 107; *Ung v. Universal Acceptance Corp.*, 319 F.R.D. 537, 543 (D. Minn. 2017) (finding a lack of predominance where "consent is too individualized an inquiry, overwhelming any questions common to the class"); *see also Espejo v. Santander Consumer USA, Inc.*, No. 12-C-9431, 2016 WL 6037625 at *9-10 (N.D. Ill. Oct. 14, 2016) (denying class certification for a TCPA claim involving debt collection calls based on the predominance of individual consent issues).

The cases upon which Ginwright relies for his argument for class certification are not persuasive. In *Ira Holtzman, C.P.A. v. Turza*, 728 F.3d 682 (7th Cir. 2013), and *Krakauer v. Dish Network LLC*, 311 F.R.D. 384 (M.D.N.C. 2015), the TCPA violation involved unsolicited advertisements or solicitations, not debt collection calls, and there was no claim of individualized consent issues. *Holtzman*, 728 F.3d at 683; *Krakauer*, 311 F.R.D. at 388*; see also Karen S. Little, L.L.C. v. Drury Inns, Inc.*, 306 S.W.3d 577, 579-80 (Mo. Ct. App. 2010) (certifying a class arising from unsolicited faxes where there was no claim of individualized consent). The cases offered by Ginwright in which courts have certified classes of debtors for TCPA claims involve calls to individuals located through "skip tracing," a practice consisting of the analysis of large datasets to identify a debtor's phone number that has not previously been provided, such that there is no argument that the debtors had consented to receive calls at the newly discovered phone number. *See Caldera v. Am. Med. Collection Agency,* 320 F.R.D. 513, 517 n.5, 519 (C.D.

Cal. 2017); *see also McMillon v. Rash Curtis & Assoc.*, No. 16-cv-03396-YGR, 2017 WL 3895764 at *2, 5 (N.D. Cal. Sept. 6, 2017). Therefore, the Court finds that Ginwright has not made the required showing under Rule 23(b)(3).

Ginwright also argues for certification under Rule 23(b)(1), based on the risk of an individual decision that would "substantially impair or impede" the ability of other class members to prosecute their claims, such as a ruling on whether the Aspect system qualifies as an ATDS. Fed. R. Civ. P. 23(b)(1)(B). Rule 23(b)(1) is most appropriately used for those cases where a decision in an individual plaintiff's case would have an "adverse practical effect" on the rights of other putative class members because of "the shared character of rights claimed or relief awarded," such as a decision that distributes property, orders the payment of a dividend, or requires payments from a limited fund that must be apportioned among prevailing plaintiffs. Fed. R. Civ. P. 23(b)(1)(B) advisory committee's note to 1966 amendment; *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 834-35 (1999). In such cases, a decision on the individual claim directly prejudices the ability of other class members to bring their own claims. *See* 7AA Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1774 (3d ed. 2005).

As discussed above, there is little risk of a ruling that the Aspect system did not qualify as an ATDS. Rather, the primary issue in this case will be whether Ginwright consented to receive calls or revoked such consent, which are individualized inquiries that would not prejudice other potential class members. For example, if a jury found that Ginwright gave consent to receive calls from Exeter and never revoked that consent, the ruling would not prevent a different Exeter customer from bringing a TCPA claim and establishing that there was no consent, or that it was revoked. Thus, a class action may not be maintained under Rule 23(b)(1). Indeed, the Court is not aware of any TCPA class action that has been certified under Rule 23(b)(1).

Finally, Ginwright's claim for certification under Rule 23(b)(2) also fails. First, the claim for monetary damages cannot be certified under this provision. *See Wal-Mart*, 564 U.S. at 360 (holding that claims for monetary relief cannot be certified under Rule 23(b)(2) when "monetary relief is not incidental to the injunctive or declaratory relief"). Rule 23(b)(2) also does not extend to allow certification "in cases in which the appropriate final relief relates exclusively *or predominantly* to money damages." Fed. R. Civ. P. 23(b)(2) advisory committee's note to 1966 amendment (emphasis added); *Thorn v. Jefferson-Pilot Life*, 45 F.3d 311, 329 (4th Cir. 2006); *Zimmerman v. Bell*, 800 F.2d 386, 389 (4th Cir. 1986). Where Ginwright seeks monetary damages of up to $1,500 per call and does not appear to need an injunction because he no longer receives calls from Exeter, the Court concludes that Ginwright's case predominantly relates to monetary damages.

Second, Rule 23(b)(2) requires that the defendant have acted on grounds that "apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Here, the legality of autodialed calls to individual class members depends on whether the class member consented to receive calls and never revoked that consent. Thus, where some class members suffered legal injury from the calls and some did not, there is no "cohesiveness among class members with respect to their injuries, the absence of which can preclude certification." *Shook v. Bd. of Cty. Comm'rs of Cty. of El Paso*, 543 F.3d 597, 604 (10th Cir. 2008); *see also Thorn*, 445 F.3d at 330. Because appropriate injunctive relief would require individualized assessments of whether particular class members are entitled to an order barring additional calls to them, certification under Rule 23(b)(2) is not warranted. *See Shook*, 543 F.3d at 604. Third, although Ginwright's Motion for Class Certification nominally seeks an injunction, it does not specify what the injunction would entail beyond "precluding

Defendants from continuing to do business in this matter." Am. Mot. Class Certification at 22, ECF No. 72. A claim for an injunction that simply orders a defendant to comply with the TCPA and follow the law is not a proper for class certification under Rule 23(b)(2). *See Ung*, 319 F.R.D. at 544 (denying Rule 23(b)(2) and Rule 23(b)(3) class certification for a TCPA claim where individualized consent issues would predominate). Thus, the class is also not maintainable under Rule 23(b)(2).

Where the proposed class does not satisfy the commonality requirement of Rule 23(a)(2) or the predominance requirement of Rule 23(b)(3), and it may not be maintained under any other prong of Rule 23(b), the Court will deny the Motion for Class Certification.

## CONCLUSION

For the foregoing reasons, Exeter's Motion for Summary Judgment is DENIED. Ginwright's Motion for Class Certification is DENIED. A separate Order shall issue.

Date: November 28, 2017

THEODORE D. CHUANG
United States District Judge